UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATHERINE ANN CYR, | : | |
| Administratrix of the Estate of | : | |
| VINCENT ALEXANDER | : | |
| DAVALOS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | NO.: _____ |
| SCHUYLKILL COUNTY, | : | |
| PRIMECARE MEDICAL INC., | : | (JUDGE _____) |
| OFFICER BETTINGER, OFFICER | : | |
| SABOL, LIEUTENANT KEPPEL, | : | |
| OFFICER KLINGER, OFFICER | : | |
| FRYE, OFFICER BENDER, | : | |
| OFFICER RAINIS, NURSE GROSS, | : | |
| and NURSE HYSOCK, | : | |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

Plaintiff, Catherine Ann Cyr, Administratrix of the Estate of Vincent

Alexander Davalos ("Mr. Davalos"), by and through her attorneys, Barry H. Dyller,

Esq., Chad J. Sweigart, Esq., and Dyller & Solomon, LLC, brings this action related

to the violation of Mr. Davalos's federally-protected rights and in support thereof,

Plaintiff alleges as follows:

## **JURISDICTION AND VENUE**

1.      This action arises out of violations of the United States Constitution

brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act and the Rehabilitation Act.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

4.      Plaintiff is Catherine Ann Cyr ("Ms. Cyr" and/or "Plaintiff") as the Administratrix of the Estate of her son, Mr. Davalos, acting pursuant to Letters of Administration issued to her by the Schuylkill County Register of Wills on January 27, 2021.

5.      At the time of his death on June 9, 2020, Mr. Davalos was an adult individual domiciled in Schuylkill County, Pennsylvania.

6.      Defendant Schuylkill County (the "County") is a municipality in Pennsylvania and owns and controls the Schuylkill County Prison (the "Prison").

7.      Defendant PrimeCare Medical, Inc. ("PrimeCare") is, based on information and belief, a Pennsylvania corporation that, at all times relevant hereto, contracted with the County to provide medical services at the Prison.

8.      By virtue of its role performing correctional facility medical care, the

acts of PrimeCare and of its employees are under color of state law.

9.     Defendant Cody Bettinger is, and was at all times relevant hereto, employed as a correctional officer at the Prison.

10.     Defendant Cory Sabol is, and was at all times relevant hereto, employed as a correctional officer at the Prison.

11.     Defendant Gary Keppel is, and was at all times relevant hereto, employed as a Lieutenant at the Prison.

12.     Defendant William Klinger is, and was at all times relevant hereto, employed as a correctional officer at the Prison.

13.     Defendant David Rainis is, and was at all times relevant hereto, employed as a correctional officer at the Prison.

14.     Defendant Carina Gross is, and was at all times relevant hereto, a nurse (presumably employed by PrimeCare) who provided medical services at the Prison.

15.     Defendant Alyssa Hysock is, and was at all times relevant hereto, a nurse (presumably employed by PrimeCare) who provided medical services at the Prison.

## FACTUAL BACKGROUND

### Mr. Davalos is Arrested, Charged And Transferred to the Prison

16.     On June 9, 2020, Mr. Davalos was arrested following a vehicle pursuit with members of the Frackville Borough Police Department.

17.     Mr. Davalos was charged with, *inter alia*, fleeing or attempting to elude a police officer.

18.     At the time, Mr. Davalos was under the influence of methamphetamines and heroin.

19.     Following his arrest, Mr. Davalos was arraigned before a magisterial district judge and immediately committed to the Prison for inability to post bail.

20.     Prior to his incarceration at the Prison on June 9, 2020, at no time ever was Mr. Davalos convicted of the charges which were filed against him that day.

21.     At some point prior to entering the Prison on June 9, 2020, Mr. Davalos ingested three Ziploc bags containing Fentanyl; one of the bags subsequently opened while in Mr. Davalos's stomach.

<u>Mr. Davalos Arrives at the Prison</u>

22.     Mr. Davalos was transported to the Prison by Officer Anthony Kankowski ("Officer Kankowski") of the Frackville Borough Police Department.

23.     At 3:11 p.m., Mr. Davalos entered the front door of the Prison with Officer Kankowski.

24.     From 3:11 p.m. until 4:12 p.m. when, based on information and belief, Mr. Davalos's cell door was last closed for the afternoon/evening, Mr. Davalos encountered, at the minimum, the following County Prison and PrimeCare

employees: Nurse Hysock, Nurse Gross, Officer Bettinger, Officer Sabol, Officer

Klinger, Officer Rainis and Lieutenant Keppel (collectively, the "Individual

Defendants").

25.     All Individual Defendants knew and/or should have known Mr.

Davalos was intoxicated, withdrawing and/or overdosing[1] based on his deteriorating

condition and the fact that it was noted in writing that Mr. Davalos had consumed

narcotics that day and that he appeared under the influence of drugs.

26.     Yet, despite the documentation of recent drug use and the direct

observation of Mr. Davalos's rapidly deteriorating physical condition during his first

hour of incarceration at the Prison indicative of extreme intoxication, withdrawal

and/or overdose, Individual Defendants did nothing, provided Mr. Davalos no

medical care, and did not place Mr. Davalos on watch or in any form of observation;

instead, Individual Defendants sent Mr. Davalos to an unmonitored cell in general

population with the cell door shut for three-and-a-half hours and left him to die.

<u>Mr. Davalos's Entry into the Prison</u>

27.     Once Mr. Davalos entered the Prison with Officer Kankowski, Mr.

Davalos first encountered Nurse Hysock, Officer Rainis and Lieutenant Keppel.

---

[1]     While Mr. Davalos was not both withdrawing and overdosing simultaneously, his symptoms, appearance and obvious inability to function made it clear that one or the other of those serious and life-threatening conditions was occurring.

28.     At or around that time, Officer Kankowski completed and provided Prison officials with an "Admissions/Intake – Inmate Screening Form" which stated that Mr. Davalos appeared to be under the influence of drugs or alcohol.

29.     Officer Kankowski also informed Nurse Hysock that Mr. Davalos lost his inhaler prior to entry into the Prison.

30.     At that time, Mr. Davalos was frisked/patted down by Officer Rainis, Nurse Hysock took Mr. Davalos's temperature and pulse, and Lieutenant Keppel glanced at Mr. Davalos's paperwork that was brought into the Prison by the police officer.

31.     Mr. Davalos made several motions to his mouth and chest that he needed his inhaler and that he was having trouble breathing.

32.     Mr. Davalos's distress was disregarded despite his alarming appearance and the clear signs of intoxication, withdrawal, and/or overdose.

33.     Nurse Hysock at this point completed the "Health Screening Form" for Mr. Davalos in which she noted "0.5g heroin QD."

34.     Nurse Hysock found that, despite Mr. Davalos's complaints about his breathing issues, he was not experiencing respiratory distress, nor did she document any other issues with Mr. Davalos's physical condition despite his obvious state of impairment, so Nurse Hysock accepted Mr. Davalos into the Prison.

## Mr. Davalos is Escorted to the Front Booking Desk

35.     At 3:14 p.m., Mr. Davalos was led by Nurse Hysock and Officer Rainis down the front office hallway toward the front booking desk.

36.     As Mr. Davalos approached the visitors' benches in the hallway, he descended a step or two and was noticeably woozy and unstable while walking.

37.     Mr. Davalos had to lean on metal lockers and a bench for support as he walked.

38.     Mr. Davalos was led towards the front booking area, where he was placed on a seat and had his handcuffs removed.

39.     While seated in the front booking area for several minutes, Mr. Davalos alternated between leaning back against the wall and slumping with his head on his hands at various points in front of, *inter alia*, Officer Rainis, Officer Bettinger and Lieutenant Keppel.

## Officer Bettinger Takes Mr. Davalos to the Property Room

40.     At 3:23 p.m., Mr. Davalos was summoned from his seat in the front booking area by Officer Bettinger.

41.     Mr. Davalos had difficulty standing and he was in obvious distress as he and Officer Bettinger proceeded from the front booking area to the property room.

42.    Indeed, Mr. Davalos could travel only at a very slow pace and he had to use the wall for support as he walked.

43.    Mr. Davalos and Officer Bettinger entered property room #1 at 3:24 p.m.

44.    At that time, Mr. Davalos was led into a changing area, where he put on a prison uniform and his clothing and shoes were collected by Officer Bettinger.

45.    Mr. Davalos reentered the main area in property room #1 at 3:28 p.m. dressed in a prison uniform.

46.    Mr. Davalos had no shoes or socks on at that time, and as he moved towards the small table in the property room Mr. Davalos was seriously, and obviously, impaired and displaying signs of drug use, withdrawal and/or narcotic overdose.

47.    Mr. Davalos took a seat at that table at 3:28 p.m.

48.    Mr. Davalos remained in the same seat until 3:51 p.m.

49.    During the twenty-three minutes he remained seated in the property room, Mr. Davalos displayed signs of extreme distress, and his intoxication, withdrawal and/or overdosed state worsened, but Officer Bettinger simply ignored Mr. Davalos's spiraling condition.

50.    For the first five minutes while Mr. Davalos remained seated, Officer

Bettinger sat with Mr. Davalos completing intake paperwork.

51.     During this period where Officer Bettinger sat directly across from

him, Mr. Davalos was physically deteriorating, as Mr. Davalos sat at points with his

head on his hands, covered his mouth with hands as though he was going to be sick,

leaned forward towards his lap and made odd motions with his hands and feet.

52.     At this point, it was noticeably apparent that Mr. Davalos was

experiencing symptoms of withdrawal or severe effects from narcotics consumption.

53.     In the paperwork he completed, Officer Bettinger noted that Mr.

Davalos had a history of drug or alcohol abuse.

54.     Officer Bettinger further noted that Mr. Davalos had the following

signs/symptoms: fever/sweating, chills, body aches, fatigue and headache.

55.     On the Prison's "Receiving Screening Form" in the "Booking

Officer's Visual Opinion" completed by Officer Bettinger, he circled **yes** regarding

the following observations: (1) "Does the inmate appear to be under the influence of

alcohol?" (2) "***Does the inmate appear to be under the influence of barbiturates,***

***heroin or other drugs?***" and (3) "***Are there any visible signs of alcohol/drug***

***withdrawal symptoms?***"

56.     Officer Bettinger further completed a "Pretrial Detainee Strip Search

Form No. 1" for Mr. Davalos, wherein he was to identify the "specific factors which

establish reasonable suspicion that the pretrial detainee possesses a weapon,

evidence of a crime, controlled substance, or other contraband, check all that apply[.]"

57.     On the Strip Search Form, Officer Bettinger placed checks next to "the appearance and demeanor of the detainee," and he also checked the other reason for the suspicion as based on "SCP Policy."

58.     Over the next few minutes, Officer Bettinger shifted between standing and sitting as paperwork for Mr. Davalos was completed.

59.     Mr. Davalos's behavior at this point continued to worsen and he showed further signs of drug intoxication, withdrawal and/or overdose.

60.     Mr. Davalos's erratic and troubling behavior included, at one point, kneeling over and putting a sock on his hand that he swung back and forth, while Officer Bettinger stood, undisturbed, less than two feet away.

61.     Mr. Davalos eventually put the socks and slip-on shoes on his feet, a task completed with great difficultly over several minutes given his impaired condition.

62.     At 3:38 p.m., Mr. Davalos was permitted to make a phone call from the property room in Officer Bettinger's presence.

63.     For the next twelve minutes, Mr. Davalos was on the phone with his mother while Officer Bettinger stood mere feet away listening.

64.     Officer Bettinger at one point during that phone conversation heard
Mr. Davalos refer to "3 O's", a fact which Officer Bettinger detailed in a prison
record, and which, based on information and belief, was a reference to the three bags
of narcotics Mr. Davalos swallowed before he was taken into custody.

65.     During the course of that phone conversation, Mr. Davalos displayed
several concerning behaviors such as fidgeting, squirming, slumping and slouching.

66.     At the conclusion of the telephone call, Officer Bettinger instructed
Mr. Davalos to rise from his seat.

67.     Mr. Davalos could barely stand, as he had to use the chair and seat to
prop himself up.

68.     Mr. Davalos was handed bedding for his cell by Officer Bettinger,
before they proceeded to the door of the property room.

69.     As Mr. Davalos attempted to exit the property room, he could not
stand on his own, as he had to first lean against a laundry basket and then on the
doorway for support.

70.     Mr. Davalos's distress was apparent as he exited the property room
and the door closed behind him.

71.     Despite his observations of Mr. Davalos's erratic and abnormal
behavior over their nearly thirty minutes together in the property room, Officer
Bettinger did not take Mr. Davalos for medical care or for close watch or

observation, and instead led him to a cell in general population.

### Officer Bettinger Escorts Mr. Davalos to his Cell on E-Block

72.     After exiting the property room, Mr. Davalos was escorted down the hallway to E-Block by Officer Bettinger.

73.     Mr. Davalos walked slowly down the hall corridor, leaning on the wall for support the entire way.

74.     Mr. Davalos was clearly suffering as he moved down the hallway.

75.     At or about 3:55 p.m., Officer Bettinger led Mr. Davalos to his cell on the second floor of the unit.

76.     Mr. Davalos had to hold onto the handrail to ascend the stairs to his cell.

77.     Officer Bettinger led Mr. Davalos to his cell, and Officer Bettinger then departed E-Block at 3:56 p.m.

### Mr. Davalos is Last Checked in his Cell at 4:12 p.m.

78.     Although Prison records indicate that Nurse Carina Gross was called to E-Block at or about 4:29 p.m. regarding respiratory complaints by Mr. Davalos, videos of E-Block reflect that this visit occurred between 4:07 p.m. and 4:12 p.m.

79.     Nurse Gross was accompanied by Officers Sabol and Klinger.  All three observed Mr. Davalos's intoxicated, withdrawing and/or overdosing state.

80.     Nurse Gross at this time noted that Mr. Davalos was having "seizure like activity w/tremors."

81.     Mr. Davalos also informed Nurse Gross that his last drug use was that day.

82.     Nurse Gross noted that Mr. Davalos had been placed on a Tylenol detox taper and she advised Mr. Davalos to increase fluids.

83.     Despite Mr. Davalos's report of drug use that day and his apparent signs of drug intoxication, withdrawal and/or overdose and despite the fact that he was having seizure like activity, Nurse Gross and Officers Sabol and Klinger did not place Mr. Davalos in a cell for observation nor did they send him to the hospital for monitoring and treatment.

84.     Instead, Nurse Gross and Officers Sabol and Klinger left Mr. Davalos alone in his cell at 4:12 p.m.

<u>Mr. Davalos is Found Unresponsive Three-and-a-Half Hours Later</u>

85.     Based on information and belief, from the time Nurse Gross and Officers Sabol and Klinger left Mr. Davalos's cell at 4:12 p.m. and until 7:42 p.m., Mr. Davalos's cell door remained shut and he was not observed, monitored and/or given medical care despite the extreme signs of withdrawal, intoxication, overdose and/or seizures that had been observed by Individual Defendants during Mr. Davalos's first hour in the Prison on June 9, 2020.

86.     Defendants forgot about Mr. Davalos until 7:42 p.m. when Officer
Sabol was doing rounds on E-Block.

87.     At that time, Officer Sabol observed Mr. Davalos laying by his cell
door.

88.     Mr. Davalos was unresponsive and not breathing.

89.     Officers Bettinger, Klinger and Frye were called to Mr. Davalos's cell,
along with Nurse Gross and Lieutenant Keppel.

90.     Chest compressions were started and Emergency Medical Services
("EMS") was contacted.

91.     Medical care was taken over by EMS upon arrival at the Prison.

92.     EMS found no signs of electrical activity.

93.     EMS administered 3 rounds of epinephrine to Mr. Davalos with no
response.

94.     EMS transported Mr. Davalos to Lehigh Valley Hospital Schuylkill
and he arrived at the hospital at 8:19 p.m.

95.     Efforts to revive Mr. Davalos were unsuccessful, and the attending
physician at the hospital pronounced Mr. Davalos's dead at 8:31 p.m.

96.     Five hours and twenty minutes after Mr. Davalos arrived at the Prison
and was under the care and custody of Individual Defendants, the County and

PrimeCare, Mr. Davalos was dead.

97.    According to a forensic pathology report, Mr. Davalos's cause of death was "acute fentanyl and amphetamine/methamphetamine toxicity."

98.    Mr. Davalos was twenty-five years old when he died.

COUNT ONE
Inadequate Medical Care
Plaintiff v. All Individual Defendants
(42 U.S.C. § 1983)

99.    Plaintiff repeats and realleges each and every allegation contained above as if fully repeated herein.

100.   Mr. Davalos, as an inmate in the Prison, had a constitutional right to adequate medical care under either the Eighth Amendment or Fourteenth Amendment to the United States Constitution.

101.   Mr. Davalos had a serious medical need at the time he was committed to the Prison on June 9, 2020 as he had a substance abuse disorder and he was intoxicated, withdrawing and/or overdosing.

102.   Although Mr. Davalos's condition was apparent and his need for medical attention and observation was evident, Mr. Davalos, after arriving at the Prison at or about 3:10 p.m. on June 9, 2020, was sent to an unmonitored cell alone by 3:55 p.m.

103.   In the first hour that Mr. Davalos was at the Prison, he physically (and mentally) deteriorated, and he could barely stand or walk without support as

confirmed by Prison video footage.

104.   Yet, all Individual Defendants observed Mr. Davalos, did nothing and sent him to an unmonitored cell to die.

105.   Indeed, despite seizure like symptoms observed at/or around 4:10 p.m., not a single County and/or PrimeCare employee checked on Mr. Davalos until Officer Sabol noticed Mr. Davalos laying on the floor of his cell when doing rounds on E-Block at 7:42 p.m.

106.   Mr. Davalos's need for medical treatment was so obvious that a lay person would easily have recognized the necessity for that treatment and the need for Mr. Davalos to be transferred to a hospital for treatment.

107.   Individual Defendants' deliberate indifference is further reflected by their failure to monitor Mr. Davalos or provide care despite the fact that he showed signs of intoxication or substance abuse as noted by Officer Bettinger and Officer Kankowski and that Nurse Gross openly indicated that Mr. Davalos revealed that he had used drugs earlier that day and was having seizures.

108.   All Individual Defendants encountered Mr. Davalos, observed his emergent medical state and did nothing.

109.   As such, all Individual Defendants were deliberately indifferent to Mr. Davalos's serious medical needs on June 9, 2020 in violation of Mr. Davalos's rights guaranteed by the Eighth and/or Fourteenth Amendments to the United States Constitution.

110.    As a result of Defendants' violations of Mr. Davalos's constitutional rights and their deliberate indifference to same, he died.

COUNT TWO
Inadequate Medical Care
Plaintiff v. the County & PrimeCare
(42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully repeated herein.

112.    The County and PrimeCare had policies, customs and/or practices that resulted in the violation of Mr. Davalos's rights under the Eighth and/or Fourteenth Amendments.

113.    Particularly, the County and PrimeCare had policies, customs and/or practices related to, *inter alia*, insufficient staffing, failing to provide adequate medical attention for inmates in immediate need of same, and failing to train employees on diagnosing and/or treating intoxicated, withdrawing or overdosing inmates.

114.    The County and PrimeCare also had a policy, custom and/or practice of failing to train, instruct, supervise and/or control their employees in recognizing when emergency medical care is required for inmates facing imminent death.

115.    Such training would have prevented Mr. Davalos from dying.  The need for such training was obvious.

116.    The County and PrimeCare further had a policy, custom and/or practice

of placing inmates in the need of emergency medical attention in the Prison without monitoring and/or close observation and without transferring those inmates to the hospital because of staffing and/or cost concerns.

117.   The County's and PrimeCare's policies, customs and/or practices concerning inmates with substance abuse disorders or inmates suffering from withdrawal symptoms are unconstitutional, in that despite their knowledge that many Prison inmates have some form of substance use disorder, they choose not to have (or not to have medically effective) policies to ease the suffering of such inmates with substance abuse disorders, or to have any requirements for treating such inmates' substance use disorders or withdrawal symptoms.

118.   The County and PrimeCare further had policies, customs and/or practices of failing to train their employees on recognizing the signs of drug overdose and responding appropriately.

119.   The County's and PrimeCare's policies, customs and/or practices were the cause of and moving force behind the violation of Mr. Davalos's Eighth Amendment and/or Fourteenth Amendment rights.

120.   Had the County and PrimeCare properly trained their employees in dealing with emergency medical situations such as overdoses, Mr. Davalos would not have died.

121.   The County and PrimeCare therefore violated Mr. Davalos's constitutional rights.

## COUNT THREE

Failure to Intervene

Plaintiff v. All Individual Defendants

(42 U.S.C. § 1983)

122.    Plaintiff repeats and realleges each and every allegation contained above as if fully repeated herein.

123.    Mr. Davalos, as described above, was deprived of his constitutional right to adequate medical care as protected by the United States Constitution.

124.    Individual Defendants, as set forth above, all failed to intervene in the denial of adequate medical care to Mr. Davalos.

125.    Individual Defendants all individually and/or jointly deprived Mr. Davalos of needed emergency medical care.

126.    As the denial of medical care continued, none of the Individual Defendants, *i.e.*, Prison officials or PrimeCare employees, intervened to stop the denial of medical care despite having several opportunities to do so throughout Mr. Davalos's initial booking at the Prison up until the time he was found unresponsive on the floor of his cell four hours and thirty minutes later.

127.    At any point during his incarceration on June 9, 2020, any of the Individual Defendants could have taken steps to arrange for medical care for Mr. Davalos, including but not limited to transfer to a hospital in light of Mr. Davalos's physical appearance indicative of extreme intoxication, withdrawal and/or overdose and the need to be monitored and treated for same.

128.    Individual Defendants all had reasonable and realistic opportunities to intervene as the denials of medical care occurred in their presence and were ongoing.

129.    These failures to intervene in the denial of emergency medical care were malicious, objectively unreasonable and conscience shocking.

130.    As a result of Individual Defendants' failure to intervene in the denial of emergency medical care to Mr. Davalos, Mr. Davalos suffered injury and death.

<u>COUNT FOUR</u>
Plaintiff v. the County
(Americans with Disabilities Act)

131.    Plaintiff repeats and realleges each and every allegation contained above as if fully repeated herein.

132.    Mr. Davalos was disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act because he had a substance abuse disorder.

133.    Substance abuse disorder is a disability within the meaning of the Americans with Disabilities Act and the Rehabilitation Act.

134.    Defendants denied Mr. Davalos the benefits of the Prison's and PrimeCare's medical programs on the basis of his disability.

135.    Defendants' choice not to provide Mr. Davalos with reasonable accommodations for his disability constituted discrimination against him on the basis of his disability.

136.    Upon information and belief, Defendants do not fail to timely

administer necessary emergency medical care to other inmates with serious medical conditions.

137.   Defendants knew of Mr. Davalos's disability.

138.   In addition, Mr. Davalos was regarded as disabled by Defendants by virtue of their knowledge of his substance abuse disorder and his withdrawal.

139.   Reasonable accommodations for substance abusers and withdrawing inmates include keeping a close watch on inmates for several days and certainly during the period they are still high on drugs and/or withdrawing from opiates; timely providing medication to calm inmates and mitigate the effects of withdrawal; and transferring inmates displaying severe signs of drug intoxication and/or withdrawal to medical facilities such as hospitals that are able to provide adequate treatment for these conditions.

140.   Despite knowing of the obvious risk that Mr. Davalos had a substance abuse disorder and was high on drugs, withdrawing or overdosing, Defendants on June 9, 2020 simply housed Mr. Davalos in general population, did not put him under any form of observation and/or watch, and did not send him to the hospital for monitoring and treatment.

141.   The County therefore acted with deliberate indifference to the risk presented by Mr. Davalos.

142.   As a result of the County's violation of the Americans with Disabilities Act, Mr. Davalos died.

<u>COUNT FIVE</u>
Plaintiff v. the County
(Rehabilitation Act)

143.   Plaintiff repeats and realleges each and every allegation made above as if fully repeated herein.

144.   The County is an entity that receives federal funding.

145.   The County's actions and inactions as described above violated the Rehabilitation Act.

146.   As a result of the County's violation of the Rehabilitation Act, Mr. Davalos died.

WHEREFORE, Plaintiff demands judgment as follows:

A. As to the County, an amount to be determined at trial plus interest;

B. As to Individual Defendants and PrimeCare, an amount to be determined at trial, including punitive damages against each of them, plus interest;

C. For plaintiff's attorneys' fees, pursuant to 42 U.S.C. § 1988;

D. For the costs and disbursements incurred in this action; and

E. For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller, Esq.
/s/ Chad J. Sweigart, Esq.
Attorneys for Plaintiff
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: <u>March 25, 2022</u>

JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CATHERINE ANN CYR

**(b)** County of Residence of First Listed Plaintiff   Schuylkill
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Barry H. Dyller (Esq.)
Dyller & Solomon, 88 N. Franklin St.,
Wilkes-Barre, PA 18701 (570) 829-4860

## DEFENDANTS
SCHUYLKILL COUNTY and
PRIMECARE MEDICAL, INC.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government
  Plaintiff
- ☒ 3 Federal Question
  *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government
  Defendant
- ☐ 4 Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **IMMIGRATION** | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 462 Naturalization Application | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983
Brief description of cause:
Defendants violated 42 U.S.C. and the ADA by deliberate indifference of needed medical care.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE                                      DOCKET NUMBER

DATE
03/25/2022

SIGNATURE OF ATTORNEY OF RECORD
*Barry Dyller*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE