## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CATHERINE ANN CYR,** | : | **CIVIL ACTION NO. 3:22-CV-453** |
| **Administratrix of the Estate of** | : | |
| **VINCENT ALEXANDER DAVALOS,** | : | **(Judge Neary)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHUYLKILL COUNTY,** | : | |
| **PRIMECARE MEDICAL INC.,** | : | |
| **OFFICER BETTINGER, OFFICER** | : | |
| **SABOL LIEUTENANT KEPPEL,** | : | |
| **OFFICER KLINGER, OFFICER FRYE,** | : | |
| **OFFICER BENDER, OFFICER** | : | |
| **RAINIS, NURSE GROSS, and** | : | |
| **NURSE HYSOCK,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

When the government holds a person in custody, it is responsible for their well-being, but it does not have to foresee all potential ailments. This is especially so when the detainee is already receiving some treatment and does not fully explain his condition. Plaintiff Catherine Ann Cyr, Administratrix of the Estate of Vincent Alexander Davalos, initiated this action against defendants after Davalos, her son, died while in Schuylkill County Prison ("SCP"). Defendants are Nurses Alyssa Hysock and Carina Gross, PrimeCare Medical Inc. ("PrimeCare"), Officers Cody

Bettinger and Corey Sabol, Lieutenant Gary Keppel, and Schuylkill County.[1] She alleges the defendants failed to provide adequate medical care to Davalos as required by the Fourteenth Amendment (through 42 U.S.C. § 1983) and, against only the County, alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et seq.* All defendants moved for summary judgment, which shall be granted.

## I. <u>Factual Background & Procedural History</u>[2]

On June 9, 2020, Frackville Borough Police responded to a domestic disturbance call where the suspect, Davalos, was fleeing the scene in a U-Haul truck. (Doc. 53 ¶¶ 13-16).[3] He crashed and was taken into custody. (<u>Id.</u> ¶¶ 16-17).

---

[1] Though her complaint additionally named Officers Frye and Bender in the caption, no claims were levied against them. Additionally, Cyr did not oppose granting summary judgment with respect to Officers William Klinger and David Rainis. (Doc. 69 at 3 n.1). Therefore, summary judgment shall be granted in favor of these officers.

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. <u>Id.</u> Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (<u>See</u> Docs. 53, 56, 66, 68). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[3] Nurses Hysock and Gross, along with PrimeCare ("Medical Defendants") are jointly represented in this matter and Lt. Keppel, Officers Sabol and Bettinger, along with the County ("County Defendants") are jointly represented. Where facts are shared and undisputed, the court cites to the Medical Defendants' statement of material facts for convenience.

While in the back of a police cruiser shortly after being arrested, Davalos was evaluated by Shenandoah EMS. (See generally Doc. 70-3). During that evaluation, he was asked "What are you so sweaty from?" to which Davalos replied he had done a few lines of meth. (Id. at 0:56-1:09). While an EMS technician can be heard saying Davalos felt "okay" and that he was not "complaining of anything," (id. at 6:09-6:19), Davalos asked to be taken to a hospital, (id. at 6:29-6:41). He then appears to clarify, saying he "wants to work out a deal" which responding police and EMS took to mean Davalos withdrew the hospital request. (Id. 6:59-7:07). Davalos was arraigned, and then a state police officer transported Davalos to SCP. (Doc. 53 ¶¶ 21-23). SCP contracts with PrimeCare to provide medical services to inmates incarcerated there. (Id. 53 ¶ 2).

Upon arriving at SCP, Davalos underwent an initial screening. (Doc. 53 ¶¶ 24-25). The purpose of the initial screening was to check Davalos for COVID symptoms or any injuries requiring hospitalization. (Id. ¶¶ 24-26). If it was reported that the detainee had recently been in an accident, it was PrimeCare's policy for the detainee to go to a hospital first for medical clearance. (Id. ¶ 27).

Nurse Hysock conducted Davalos's initial screening, as Lt. Keppel watched on. (Id. ¶¶ 28, 46). During his screening, Davalos reported having taken heroin earlier that day and appeared intoxicated, as well as sweaty. (Id. ¶¶ 30-32). Additionally, he reported he was having an asthma attack and needed his inhaler.

(Doc. 53 ¶¶ 36-37). According to Nurse Hysock's incident report,[4] Davalos had an oxygen saturation level of 97%, a pulse of 92, and clear lungs. (Doc. 53-6). After conferring with a provider on Davalos's medical history, Nurse Hysock received an order for him to be placed on medication tapers to treat the anticipated withdrawal symptoms. (Doc. 53 ¶ 43). It is disputed whether Nurse Hysock was aware Davalos had been in an accident. She claims she was unaware of the motor vehicle crash, (Doc. 53 ¶ 40), but Lt. Keppel stated the transporting officer told them both about the crash, (Doc. 70-35, Deposition of Gary Keppel (hereinafter "Keppel Dep."), 13:13-14:3). After completing the screening, Davalos was accepted to SCP and, since her shift was over, Nurse Hysock left the facility. (Doc. 53 ¶¶ 50, 52).

Officer Bettinger then came to perform the security intake for Davalos. (Id. ¶ 53). He answered all of Officer Bettinger's questions, though he may have nodded off at times, and Officer Bettinger was able to complete a strip search without issue. (Id. ¶¶ 55-56; Doc. 70-21 at 17:50-18:30). During intake, Davalos was allowed to call his mother. (Doc. 56 ¶ 31). Cyr claims that during this call, Davalos told her "he couldn't breathe" as Officer Bettinger listened on. (Doc. 70-24 at 84:1-18). Davalos also asked Officer Bettinger for his inhaler at some point during intake, but the officer did not provide him with one or take any other action on Davalos's request. (Doc. 70-21 at 20:22-20:52). After the security screening, Davalos was taken to Echo

---

[4] Nurse Hysock's incident report was not created contemporaneously with her examination of Davalos, but rather, at 9:45 p.m., after Davalos had been pronounced deceased. (Doc. 53-6; Doc. 53 ¶ 85; Doc. 56 ¶ 40; Doc. 66 ¶ 84). SCP requested Nurse Hysock complete the incident report after Davalos's death, which is typical in that type of situation. (Doc. 70-10 39:16-40:20).

Block, where correctional officers were to conduct hourly checks. (Doc. 53 ¶¶ 60-61). It was corporate policy for PrimeCare to conduct a lengthy, detailed medical screening within four hours of an inmate's arrival to a facility. (Id. ¶¶ 62, 65).

Officer Sabol was the guard working at Echo Block the day Davalos was at the jail. (Doc. 70-28, Deposition of Cory Sabol, 29:9-23). When Officer Sabol was collecting dinner trays from the inmates, Davalos said he had trouble breathing and needed his inhaler. (Id. at 31:12-14). At that point, Nurse Gross was called to Echo Block to evaluate Davalos. (Doc. 53 ¶ 68). When she arrived, she found Davalos having seizure-like activity with tremors in his arms. (Id. ¶¶ 69-70). Nurse Gross then administered an ammonia inhalant. (Id. ¶ 71). After being given the inhalant, she found Davalos able to follow commands, his pupils equal and reactive, and that his vital signs were stable and within normal limits. (Id. ¶¶ 72-73). Davalos was scheduled to receive his medications to treat withdrawal symptoms at around 9 p.m. (Id. ¶ 78).

Davalos was then left undisturbed. Officer Sabol would conduct checks of the inmates every so often. Video evidence shows Officer Sabol walking on Davalos's room's level from 4:04 p.m. to 4:13 p.m., 5:29 p.m. to 5:32 p.m., various times between 5:49 p.m. to 6:15 p.m., 7:38 p.m. to 7:39 p.m., and lastly at 7:42 p.m. (See generally, Doc. 70-27). During that last check, Officer Sabol discovered Davalos lying in his cell. (Doc. 66 ¶ 84). Lifesaving measures were undertaken, and Davalos was transported a hospital and pronounced dead at 8:31 p.m. (Doc. 53 ¶ 85; Doc. 56 ¶ 40; Doc. 66 ¶ 84). An autopsy report determined the cause of death to be acute fentanyl and amphetamine/methamphetamine toxicity caused by the rupture of one

of three bags of fentanyl that Davalos had ingested. (Doc. 53 ¶¶ 86-87). At no point

did anyone ask Davalos if he had ingested any drugs, nor did Davalos ever

volunteer that information. (Doc. 53 ¶¶ 51, 58, 74; Doc. 66 ¶¶ 51, 58, 74).[5] In other

words, it was not until the autopsy that anyone other than Davalos learned that he

had ingested three bags of fentanyl.

**II.**    **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary

judgment is appropriate if the moving party "shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a). A factual dispute is material if resolution of it "might affect the

outcome of the suit under the governing law" and genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." Mall

Chevrolet, Inc. v. General Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When considering a

motion for summary judgment, a court must view the evidence in the light most

favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citing

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court's duty is not "to

---

[5] Officer Bettinger claims to ask all inmates if they have any drugs "in or on you" yet, there was never a specific finding made to Davalos. (Doc. 66 ¶ 57). Additionally, there is no documentation to support Officer Bettinger having ever asked about drug use. (Id.). Looking at the evidence in the light most favorable to Cyr, the court assumes Officer Bettinger never asked whether Davalos had drugs in him for the purposes of this opinion.

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 242-43.

There are "two closely related methods for a movant to succeed at summary judgment." <u>Mall Chevrolet</u>, 99 F.4th at 630. "First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law." <u>Id.</u> (citing FED. R. CIV. P. 56(a)). "Second, under the <u>Celotex</u> approach, a moving party may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case *on which that party will bear the burden of proof at trial.*'" <u>Id.</u> (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

The nonmoving party can defeat a motion for summary judgment by producing evidence to establish a genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 256. The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> The party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. Moreover, if the nonmovant's version of disputed facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

III.  **Discussion**

As Cyr claims all defendants provided inadequate medical care to Davalos, the court begins with that claim.

**A. Applicable Law**

To prevail on an inadequate medical care claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (quoting Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). There is no dispute in this case whether Davalos's medical needs were serious; they were. (Doc. 54 at 11; see generally Doc. 59).[6] As such, the analysis now turns to whether the record can establish deliberate indifference in this case.

**1. Applicability of Kingsley**

Before getting to the claims themselves, Cyr raises a jurisprudential issue. Per the Third Circuit Court of Appeals, a claim of inadequate medical care for a pre-trial detainee, brought under the Fourteenth Amendment, is currently evaluated under the same standard as a convicted prisoner's claim under the Eighth Amendment. Hubbard v. Taylor, 399 F.3d 150, 166 n.22 (3d Cir. 2005). Cyr, however, urges the court to adopt a standard of "objective unreasonableness" as articulated in Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015). (Doc. 67 at 4).

---

[6] Though in the question presented, the County Defendants say Davalos's needs were not serious, (Doc. 59 at 4), in the body of the brief, they attack whether anyone in the prison *knew* if his conditions were serious, (id. at 8-9).

Although <u>Kingsley</u> deals with a pre-trial detainee, the Court only analyzed an

excessive force claim, not a claim of inadequate medical care. <u>Kingsley</u>, 576 U.S. at

391-92. To date, our court of appeals has yet to comment on whether <u>Kingsley</u>

applies to areas outside of excessive force for pre-trial detainees. <u>Moore v. Luffey</u>,

767 F. App'x 335, 340 n.2 (3d Cir. 2019) (non-precedential).[7] Instead, post-<u>Kingsley</u>,

the Third Circuit and other district courts within its ambit have applied the

deliberate indifference standard in non-excessive force contexts. <u>See e.g.,</u> <u>Thomas</u>

<u>v. City of Harrisburg</u>, 88 F.4th 275, 281 & n. 23 (3d Cir. 2023); <u>Andrews v. Harper</u>,

576 F. Supp. 3d 305, 314 (W.D. Pa. 2021) (collecting cases).

Until our court of appeals rules otherwise, this court declines Cyr's invitation

to depart from existing caselaw and continues to apply the established precedent

analyzing Fourteenth Amendment deliberate indifference claims under the Eighth

Amendment's framework. <u>Cf.</u> <u>United States v. Orocio</u>, 645 F.3d 630, 648 (3d Cir.

2011) (Chagares, J., concurring) (cautioning against "extrapolating from [a Supreme

Court case's] implications a holding on an issue that was not before that Court in

order to upend settled circuit precedent."), <u>abrogated</u> <u>by</u> <u>Chaidez v. United States</u>,

568 U.S. 342 (2013).

---

[7] This court notes there is a split among other circuits as to whether the <u>Kingsley</u> analysis should be extended beyond the force context. <u>See</u> <u>Brawner v. Scott Cnty., Tennessee</u>, 14 F.4th 585, 595-94, 596 (6th Cir. 2021) (identifying the Second, Seventh, Ninth, and, later in that opinion, the Sixth Circuits expanding <u>Kingsley</u> while the Fifth, Eighth, Tenth, and Eleventh Circuits not extending <u>Kingsley</u> to non-excessive force claims).

### 2.  Deliberate Indifference

When analyzing a deliberate indifference claim, our court of appeals has clarified:

> there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim. The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury. The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony.

Pearson, 850 F.3d at 536. In this case, Cyr's expert has opined that the care provided to Davalos was inadequate. (Doc. 51-2 at 8). In viewing the record in the light most favorable to Cyr, the court will assume that prong of deliberate indifference has been met. Thus, to grant defendants' motions, they must show there is no dispute about the subjective state of mind of the individual defendants.

To prove deliberate indifference, a plaintiff must show "that prison officials knew of and disregarded 'an excessive risk to inmate health or safety,' meaning a 'substantial risk of serious harm.'" Durham v. Kelley, 82 F.4th 217, 229 (3d Cir. 2023) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "Indifference to a substantial risk of serious harm is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, or a denial of reasonable requests for treatment that leads to suffering or risk of injury." Id. at 230 (citing Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993)).

### B.  The Medical Defendants

Cyr alleges Nurses Hysock and Gross denied Davalos adequate medical care, and that their employer, PrimeCare, should be liable for failure to train them. The

Medical Defendants argue that the undisputed material facts concerning deliberate indifference entitle them to summary judgment. They are correct, and summary judgment will be granted in their favor.

1. **Nurse Hysock**

The strongest fact cited by Cyr in support of claims against Nurse Hysock is that the transporting officer told her Davalos had been in a motor accident. (Doc. 66 ¶ 27). However, while perhaps establishing negligence, such fact does not establish Nurse Hysock was deliberately indifferent to Davalos's condition. Nowhere in the record is there anything establishing Davalos had any physical ailments related to the motor accident. So, while she may have failed to follow PrimeCare policy, that failure would be negligence at worst, not deliberate indifference.

Davalos presented with trouble breathing, potentially due to his asthma, trouble walking, and appeared intoxicated. (Doc. 67 at 12). At the same time, nothing in the record suggests he ever asked Nurse Hysock if he could be sent to a hospital due to a life-threatening condition. Instead, to Nurse Hysock, Davalos presented as someone who appeared to be under the influence. (Doc. 70-10, Deposition of Alyssa Hysock (hereinafter, "Hysock Dep."), 45:6-11). His pupils were normal. (Hysock Dep. 46:19-21). After conferring about his state with a provider, Nurse Hysock received an order to treat Davalos's anticipated withdrawal symptoms. (Doc. 53 ¶ 43). She rendered treatment based on her view of the circumstances.

Even assuming she was wrong, and that the standard of care demanded her to recognize Davalos's symptoms as overdosing rather than withdrawal, Cyr cannot

establish Nurse Hysock was deliberately indifferent. In response to his complaints about asthma, Nurse Hysock retrieved a pulse ox machine and found his oxygen saturation to be acceptable. (Doc. 53 ¶ 44; Hysock Dep. 51:22-25).[8] His withdrawal medications had been ordered and were on their way.

Thus, Nurse Hysock did not refuse to provide medical care to Davalos; she completed her intake assessment. Conferring with a provider, Davalos was to receive medication to treat expected withdrawal symptoms, so no prescribed medical treatment was denied. Finally, Davalos never made any requests for treatment to Nurse Hysock that would have prevented his death. Therefore, Cyr has failed to establish Nurse Hysock was deliberately indifferent in treating Davalos.

### 2. Nurse Gross

Cyr's attempts to establish deliberate indifference against Nurse Gross fair no better. For one, Cyr is incorrect when she says, "Nurse Gross did not actually treat Davalos." (Doc. 67 at 15). When Nurse Gross responded to a call to check on Davalos, she administered an ammonia inhalant. (Doc. 53 ¶ 71). After that, Davalos was able to follow commands and his vital signs were stable and within normal

---

[8] Cyr points out that Nurse Hysock did not document Davalos' pulse and oxygen saturation level until after his death. (Doc. 66 ¶ 44). However, she points to nothing in the record disputing Davalos' actual oxygen saturation level or Nurse Hysock's more general testimony that Davalos' oxygen saturation was within acceptable limits.

limits. (Id. ¶¶ 72-73).[9] His pupils were equal and reactive. (Id. ¶ 72). Davalos was told to increase his fluid consumption and that he would be getting medication to withdrawal symptoms in a few hours. (Id. ¶¶ 76-77).

Cyr also argues Nurse Gross was deliberately indifferent by not offering Davalos more care despite knowing the detailed medical screening would not occur for several more hours. (Doc. 67 at 15-16). This delay was due to supposed staffing shortages. (Id. at 16). But there is no support in the record that after Nurse Gross treated Davalos with ammonia salts, he suffered any more noticeable symptoms. Rather, the only evidence is that after Davalos was aroused, his vital signs were normal and his pupils were reactive. From this, it is not clear there was an immediate need for further medical treatment. Additionally, there has been no suggestion Davalos asked Nurse Gross for a specific kind of medical treatment. Thus, medical care was rendered and no care was denied. True, Davalos's drug tapers were to come later, but the record does not demonstrate Davalos was in need of receiving the detoxification medicine earlier. So, whether there was a nursing shortage at the prison is immaterial; Davalos did not receive an earlier screening because Nurse Gross determined Davalos was stable. (Doc. 53 ¶¶ 72-73, 75).

Additionally, the cases cited by Cyr to establish Nurse Gross was deliberately indifferent are not persuasive. First, Sandoval v. County of San Diego, 985 F.3d 657 (9th Cir. 2021), is factually distinguishable from this case. In Sandoval, one nurse

---

[9] Cyr's response is that only Nurse Gross' chart notes report Mr. Davalos following commands and that his vital signs were normal. (Doc. 66 ¶¶ 72-73). Once again, she fails to point to anywhere else in the record disputing these facts.

initially evaluated the decedent, placed him in a prison cell used for medical monitoring, and did not check on him for over six hours. Id. At 670. Additional personnel were deliberately indifferent by failing to immediately call paramedics when the decedent was found unresponsive. Id. at 670-71. In this case, by contrast, Nurse Gross did not make any determinations to leave Davalos unattended; she responded to a call for help, treated him, and judged him to be fit to continue to be in his routinely monitored cell. (Doc. 53 ¶¶ 68-79). Additionally, once Davalos was found unresponsive, lifesaving measures were immediately undertaken, and he was sent to a hospital. (See Doc. 53 ¶ 85; Doc. 53-7).

Grote v. Kenton County, Kentucky, 85 F.4th 397 (6th Cir. 2023) is also unavailing. In that case, when the nurse was dealing with the decedent, she was originally unable to take the decedent's blood pressure because "he was twitching and unable to hold still." Id. at 401. The decedent's "oxygen level registered at 89 percent, and he was hyperventilating." Id. The nurse in Grote never took any other vital signs. Id. Conversely, when Nurse Gross arrived to treat Davalos, he became easily aroused with an ammonia inhalant. (Doc. 53 ¶ 71). Additionally, she documented that Davalos was able to follow commands, his pupils were equal and reactive, and that his vital signs were stable and within normal limits. (Id. ¶¶ 72-73). Unlike Grote, the record does not show Davalos "was in clear medical distress of a

magnitude requiring emergency medical attention." <u>Grote</u>, 85 F.4th at 410.[10]

### 3. PrimeCare

Cyr also makes a claim that PrimeCare itself is liable for not providing adequate medical care to Davalos. A plaintiff's assertion of liability for constitutional violations under Section 1983 against an entity can be sustained based on the U.S. Supreme Court's ruling in <u>Monell v. New York City Department of Social Services</u>. <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003). In making this <u>Monell</u> claim, the entity is not liable through respondeat superior or vicarious liability, rather, plaintiffs must show "there was a relevant [ ] policy or custom, and that the policy caused the constitutional violation they allege." <u>Id.</u>

For Cyr, her <u>Monell</u> claim has three major charges: (1) insufficient staffing by PrimeCare; (2) failure to provide adequate medical attention to inmates in need of care; and (3) failure to properly train its employees on recognizing when emergency medical care is needed and the difference between withdrawal and overdosing. (Doc. 1 ¶¶ 113-14). None of these assertions passes muster.

Regarding the first, as already discussed, it is simply not the case that insufficient staffing played a role in Davalos's death. This is crucial because for any <u>Monell</u> claim, there must be a "a causal link between the execution of the policy and

---

[10] Further, in <u>Grote</u>, the 6th Circuit was conducting its deliberately indifferent analysis under an objective framework, rather than the subjective standard this court is continuing to use. <u>See</u> <u>Grote</u>, 85 F.4th at 405. This is yet another facet making that case inapplicable to this one.

the injury suffered." <u>Kranson v. Valley Crest Nursing Home</u>, 755 F.2d 46, 51 (3d Cir. 1985) (quoting <u>Losch v. Borough of Parkesburg</u>, 736 F.2d 903, 910 (3d Cir.1984)). Davalos was seen by two nurses during his stay, one almost immediately upon his arrival to the facility. (<u>See</u> Doc. 53 ¶¶ 28-29, 68; Doc. 66 ¶¶ 28-29, 68). Next, when a guard noticed Davalos was in distress, the guard called for help and Nurse Gross appeared shortly thereafter. (<u>See</u> Doc. 53 ¶ 68; Doc. 66 ¶ 68). Thus, Davalos clearly had access to medical personnel. That he was only scheduled to receive his detoxification medication as well as have a full medical evaluation later in the evening is beside the point. Cyr has marshalled no evidence that the Constitution requires an in-depth medical exam for all new admissions to a prison within a few hours of arrival.[11] To the extent Davalos suffered a "delay" in treatment, it was caused by a misdiagnosis of his problem—not staffing levels. As such, this claim fails.

Nor is there any evidence of a constitutional violation regarding adequate medical care. While Cyr is correct a <u>Monell</u> claim can lie even when no individual is liable, that is only true when there is still an underlying constitutional violation. <u>See Mervilus v. Union Cnty.</u>, 73 F.4th 185, 196-97 (3d Cir. 2023). Here, Cyr failed to show anyone from PrimeCare was deliberately indifferent to Davalos's conditions. Both Nurse Hysock and Gross administered treatment to Davalos. Perhaps their treatment was negligent, but their actions demonstrate they were not deliberately

---

[11] Indeed, even Cyr's own expert concedes such initial screens are done "typically within 24 hours of admission." (Doc. 70-13 at 3).

indifferent. Put another way, it cannot be proven that someone (or the entity) knew of Davalos's condition and ignored it.

Moving to the training claims, the Third Circuit has clarified that "[o]rdinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" Thomas v. Cumberland Cnty., 749 F.3d 217, 223 (3d Cir. 2014) (quoting Connick v. Thompson, 563 U.S. 51, 62, (2011)). There are exceptions when "the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.'" Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 109 (1989)).

With respect to PrimeCare, however, Cyr's claims are not that there was a failure to train, but that the training provided was inadequate. For example, she acknowledges that PrimeCare had policies on giving immediate medical care to inmates who need it; she just claims that policy was not followed in this case. (See Doc. 67 at 19-20). Even her own expert concedes that Relias, the training service used by PrimeCare, "presents the PrimeCare protocols in an educationally sound format." (Doc. 70-13 at 12). It is therefore undisputed that PrimeCare offered relevant training to its employees, the question is whether it was enough or being properly followed.

Because PrimeCare *did* see a need for training and *did* offer relevant training Cyr's Monell claim does not fit into the Canton exception and so the ordinary prerequisite of a "pattern of violations" applies. See Thomas, 749 F.3d at 223. As the Supreme Court has said, "[t]hat a particular officer may be unsatisfactorily trained

will not alone suffice [for <u>Monell</u> liability], for the officer's shortcomings may have resulted from factors other than a faulty training program." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390-91 (1989). Moreover, a <u>Monell</u> claim does not arise when "an otherwise sound program has occasionally been negligently administered." <u>Id.</u> at 391. Cyr has not shown evidence of a pattern of violations, focusing only the harm to Davalos. (<u>See</u> Doc 67 at 19-20). Because PrimeCare had relevant policies to prevent overdose deaths, the burden for Cyr is to show that those policies were repeatedly violated. She may have shown certain policies were not followed for Davalos specifically, but she has failed to show this is a widespread problem.

## C. The County Defendants

Cyr similarly alleges the County Defendants failed to provide Davalos with adequate medical care, and that Schuylkill County is responsible for their failure. The County Defendants argue in response that their personnel were not deliberately indifferent and even if they were, qualified immunity shields them from liability.

### 1. Lieutenant Keppel

Lt. Keppel was present only for Davalos's initial booking, (Doc. 1 ¶¶ 27, 39), while Nurse Hysock conducted the intake screening, (Doc. 56 ¶ 14). The strongest piece of evidence against Lt. Keppel is that he reported being told Davalos was involved in a motor vehicle accident. (Keppel Dep. 13:10-14:3). The policy of SCP was to send any new admittee who had been in an accident to the hospital for evaluation. (Hysock Dep. 21:4-8). Just as with Nurse Hysock, at most this is

negligence on the part of Lt. Keppel for failing to follow policy.[12] There is nothing in the record suggesting Davalos suffered any injuries from the motor vehicle accident or that his condition upon entering the prison was in any way related to the car crash. (Doc. 56 ¶ 39; Doc. 66 ¶ 47). Otherwise, Lt. Keppel observed Davalos being evaluated by Nurse Hysock, (Doc. 56 ¶ 14), and he may rely on her medical judgements, Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). And so, the court will grant summary judgment in Lt. Keppel's favor.

### 2. Officer Sabol

As to Officer Sabol, Cyr's claims boil down to his failure to conduct his proper routine checks of the inmates in Echo Block. (Doc. 12-13). Although correctional officers are to perform hourly checks on inmates in Echo Block, (Doc. 53 ¶ 61), the evidence is clear: Officer Sabol did not perform a check at 7:00 p.m., (Doc. 70-27 at 3:05:10-4:28:22).[13] As elsewhere, this action is negligence and not deliberate indifference. Officer Sabol was there when Nurse Gross was called to check on Davalos who reported difficulty breathing. (Doc. 56 ¶¶ 35, 37). After treating him with an ammonia inhalant (Doc. 53 ¶ 71), Nurse Gross cleared Davalos to stay in incarceration. (Doc. 56 ¶ 37). Thus, as far as Officer Sabol knew, Davalos was fine.

---

[12] "[P]olices do not determine constitutional law." Smith v. Freland, 954 F.2d 343, 348 (6th Cir. 1992). See also Bornstein v. Monmouth Cnty. Sheriff's Off., 658 F. App'x 663 (3d Cir. 2016) (non-precedential) (citing Smith, 954 F.2d at 347-48) ("But the issue is not whether they violated internal prison policies but whether they violated the Constitution.").

[13] County Defendants claim Officer Sabol conducted a check at 7:00 p.m. That is plainly not true upon review of the video evidence. (Doc. 70-27 at 3:05:10-4:28:22). Counsel is reminded of the duty of candor owed to this court.

He had been seen by a medical professional and the only evidence in the record reports Davalos's condition at the time to be stable. (Doc. 56 ¶ 37).

### 3. Officer Bettinger

The story is a bit complicated with respect to Officer Bettinger. There is a dispute over whether Officer Bettinger overheard Davalos say to his mother that he could not breathe. (See Doc. 70-24, at 84:1-18). While Officer Bettinger knew Davalos had been "cleared by medical" before he saw him, (Doc. 70-21 at 9:16-9:19), he also did not know the details of Nurse Hysock's examination, (id. at 27:55-28:05). Further, Officer Bettinger admitted that Davalos requested an inhaler, but he never informed anyone else about that request, saying he "forgot." (Id. at 20:22-20:52). Still, Davalos was well-enough to answer all of Officer Bettinger's questions. (Doc. 56 ¶ 26). Even if Officer Bettinger heard Davalos say he could not breathe, that would be undercut by the fact that Bettinger clearly had conversations with Davalos; he therefore could breathe well enough to talk. Finally, Officer Bettinger was not told by medical staff to pay extra attention to Davalos or treat him any different than a normal inmate. Deliberate indifference is a high bar to clear and, reviewing these facts, the court finds no reasonable jury could find Officer Bettinger knew of and disregarded an *excessive* amount of risk to Davalos. See Durham v. Kelley, 82 F.4th at 229.

And even if he were deliberately indifferent, Officer Bettinger would be protected by qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly

established at the time of the challenged conduct." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).

Cyr claims that the Supreme Court's decision in <u>Estelle v. Gamble</u> had firmly established the right to adequate medical care. (Doc. 69 at 17-18) (quoting <u>Evans v. Columbia Cnty.</u>, 711 F. Supp. 3d 256, 307-08 (M.D. Pa. 2024), <u>dismissed,</u> No. 24-1227, 2024 WL 3676934 (3d Cir. Apr. 16, 2024)). However, the Third Circuit recently stressed that courts should not "analyze rights so abstractly. Instead, existing law must clearly establish that what *this* officer did in *these* circumstances violated the plaintiff's rights." <u>Urda v. Sokso</u>, 146 F.4th 311, 314 (3d Cir. 2025). <u>Estelle</u>'s general requirement to provide adequate medical care is therefore a too abstract framing of Davalos's rights in this case. Moreover, <u>Estelle</u> itself is unhelpful to Cyr because in that case, the Court found no rights had been violated. 429 U.S. 97, 107-08 (1976).

Cyr's attempts to lean on the 2023 Third Circuit decision in <u>Thomas v. City of Harrisburg</u>, is also unavailing. (Doc. 69 at 18). For one, <u>Thomas</u> was issued about two and half years *after* the events giving rise to this case. (Doc. 53 ¶¶ 13-16). To overcome a qualified immunity analysis, the right must be clearly established *at the time* of the conduct. <u>See</u> <u>Urda</u>, 146 F.4th at 313 (citation omitted). Even putting that aside, the circumstances of <u>Thomas</u> are wholly different than what occurred here. In <u>Thomas</u>, an officer observed the plaintiff with "pasty white" lips and saw "cocaine rocks fall out of [his] shirt." 88 F.4th at 278-79. That officer suspected the plaintiff in <u>Thomas</u> had ingested a large amount of cocaine. <u>Id.</u> at 279.

Here, there were no physical signs of drugs on Davalos's person. While Officer Bettinger suspected Davalos had taken some sort drugs, (Doc. 70-21 at 7:14-

7:32), there is nothing to suggest Officer Bettinger had reason to believe this was a significant amount. While he did not know the specific details, Officer Bettinger did know Davalos had been evaluated by medical personnel in some capacity before he conducted his screening. (Id. at 9:16-9:19). Cyr has not shown a case where, after having been seen by medical staff, an officer violated a pre-trial detainee's rights for securing additional medical care when the detainee was still somewhat responsive. Therefore, the court cannot say Officer Bettinger was "plainly incompetent" given the circumstances of this case. al-Kidd, 563 U.S. at 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Qualified immunity would shield Officer Bettinger in this case, even if he were deliberately indifferent.

### 4. Schuylkill County

Cyr levies the same arguments against Schuylkill County as she does against PrimeCare. (Doc. 1 ¶¶ 111-21). In her brief, she mainly tries to tie PrimeCare's deficiencies to the County. (Doc. 69 at 13-15). Therefore, the analysis with PrimeCare applies equally to the County. To briefly summarize, the alleged deficient policies of the County are not responsible for Davalos's death. To the extent there were customs or practices of failing to abide by official policies, Cyr has failed to provide evidence of a pattern of violations necessary to make a claim against the County itself. Without repetitive violations, Cyr cannot demonstrate this was anything other than "an otherwise sound program [that] has [been] occasionally been negligently administered." City of Canton, 489 U.S. at 391. Accordingly, the County is entitled to summary judgement on the Monell claims as well.

**D. ADA/RA Claims**

Cyr finally claims the County violated the ADA and RA[14] by failing to reasonably accommodate Davalos's addiction disability by giving him adequate care and access to other prison services. She argues the County should have accommodated Davalos's disability, his substance use disorder, by placing him on medical watch or, in the alternative, having sent him to a hospital for treatment. (Doc. 1 ¶¶ 139-40; Doc. 69 at 19). However, in making a failure to accommodate claim, a plaintiff must show the defendant knew of "both the disability and *desire* for an accommodation." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999) (emphasis added). Nowhere in the complaint does Cyr ever allege Davalos requested an accommodation or what that accommodation must be. (See Doc. 1 ¶¶ 131-46).

Scouring the record in the light most favorable to Cyr, only one piece of evidence possibly could relate to a request for an accommodation regarding his substance use disorder. When Davalos was first being arrested, he seems to say he would rather go to a hospital. (Doc. 70-3 at 6:38-7:06). However, that request was made to Frackville police officers and unidentified EMT workers. (See Doc. 56 ¶ 9; Doc. 68 ¶ 9). No evidence has been provided linking either the Frackville police officers or the EMTs to Schuylkill County. As such, there is nothing in the record

---

[14] "With limited exceptions, the same legal principles govern ADA and RA claims." CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 235 (3d Cir. 2013) (internal footnote omitted). None of those exceptions are pertinent here and neither party disputes the same legal standards applies in this matter. (See Doc. 59 at 18-19; Doc. 69 at 19).

establishing that Schuylkill County knew Davalos had requested any sort of accommodation. Because there were no requests for accommodations, Cyr's ADA and RA claims must fail. <u>See</u>, <u>e.g.</u>, <u>Hanafy v. Hill Int'l, Inc.</u>, 669 F. Supp. 3d 419, 438-39 (E.D. Pa. 2023); <u>Drozdowski v. Northland Lincoln Mercury</u>, 321 F. App'x 181, 184-85 (3d Cir. 2009) (non-precedential).

## IV.    <u>Conclusion</u>

After reviewing the record in the light most favorable to her, Cyr failed to show any individual defendant was deliberately indifferent in responding to her son's medical needs. She also failed to show a pattern of constitutional violations necessary to establish <u>Monell</u> liability. Thus, defendants' motions for summary judgment shall be granted.[15] An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    September 30th, 2025

---

[15] Because the court is granting the Medical Defendants' summary judgment motion, their motion *in limine* will be denied as moot.